ROBERTA SCHREIBER ULMER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Ulmer v. Commissioner
Docket Nos. 12602-91, 14026-91, 14348-91, 14349-91
United States Tax Court
T.C. Memo 1994-234; 1994 Tax Ct. Memo LEXIS 241; 67 T.C.M. (CCH) 3008; May 26, 1994, Filed *241 R determined that the Estate of C (EC) was liable for gift and estate taxes that arose from alleged gifts made by C to C's children, petitioner R (PR) and petitioner M (PM), during the taxable period ending June 30, 1979. Sec. 2501, I.R.C. Specifically, R asserts that C entered into an enforceable contract to make gifts to PR. PR denies that C was obligated to transfer property under New York law. R also asserts that C sold an interest in the family business to PM for less than adequate consideration. PM argues that adequate consideration was provided for the transfer of the business interest. R has also asserted that PR and PM are liable as transferees for gift taxes owed due to taxable transfers during that period. Sec. 6324(b), I.R.C. R also asserts that EC is liable for a fraud penalty pursuant to sec. 6653(b), I.R.C.
1. Held: EC is not liable for gift tax owed for a transfer of property from C to PM during the period in issue. No gift tax liability arose because the promised transfer did not occur during that period. 2. Held, further, EC is not liable for gift tax owed for gifts made by C to PR during the period in issue. No gift tax liability arose *242 because C was not obligated under New York law to make transfers to PR during that period. 3. Held, further, PR is not liable as a transferee under sec. 6324(b), I.R.C.
4. Held, further, PM is not liable as a transferee under sec. 6324(b), I.R.C.
5. Held, further, EC is not liable for a fraud penalty pursuant to sec. 6653(b), I.R.C., because R has not carried her burden of proving liability. Rule 142(b), Tax Court Rules of Practice and Procedure.
For petitioners: Matthew F. Sarnell, Stanley L. Kantor, Gregory A. Robinson, and Melvin Paradise. For respondent: Frances Ferrito Regan and Pamela L. Cohen. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: Respondent has determined deficiencies in both estate tax and gift taxes, and additions to tax in connection with the gift taxes, against petitioner Estate of Cecil Rosenblatt, Deceased, Roberta Schreiber Ulmer, Hannah Goldstein, and Iris Gruenebaum, Administratrices, C.T.A. (the Estate). Respondent has also determined that petitioners Roberta Schreiber Ulmer (Roberta) and Marvin Rosenblatt (Marvin) are liable as transferees of the property of Cecil Rosenblatt (Cecil) for *243 a deficiency in gift tax, and for an addition to tax, for the calendar quarter ended June 30, 1979. Because these cases involve common questions of fact, they have been consolidated for trial, briefing, and opinion. The deficiency in estate tax determined by respondent against the Estate in docket No. 14349-91 is $ 187,490.73. The deficiencies in gift tax and additions to tax determined by respondent against the Estate in docket No. 14348-91 are as follows: Additions to Tax
Period Ending Gift Tax
6653(b) [2]
June 30, 1979
$ 1,751,979.70
$ 875,989.85
December 31, 1979
3,393.00
1,696.50
June 30, 1980
18,217.50
9,108.75
September 30, 1980
17,360.71
8,680.36
December 31, 1980
1,332.50
666.25
March 31, 1981
41,650.00
20,825.00
June 30, 1981
45,488.95
22,744.48
December 31, 1981
84,706.04
42,353.02
December 31, 1982
87,633.85
43,816.93
December 31, 1984
31,375.30
15,687.65
Total
2,083,137.55
1,041,568.79
*244 The liability as a transferee determined by respondent against Roberta in docket No. 12602-91 is $ 600,000. The liability as a transferee determined by respondent against Marvin in docket No. 14026-91 is $ 1,800,000. The parties have settled numerous issues and have left for our decision only the ramifications of certain events occurring during June 1979. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the taxable period in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some facts have been stipulated and are so found. The stipulation of facts filed by the parties and accompanying exhibits are incorporated herein by this reference. Residences
At the time the petitions in these cases were filed, the residence of Marvin was in New York, New York, and the residence of Roberta was in Baltimore, Maryland. The Family
Cecil was the wife of William Rosenblatt, deceased (William). Their children were Marvin, Roberta, Hannah Goldstein (Hannah), and Iris Gruenebaum (Iris) (collectively, the children). Cecil died on May 12, 1986. William's Death
William predeceased *245 Cecil, dying on January 31, 1977. At the time of William's death, he owned a 90-percent interest in the William Rosenblatt partnership (WR), and Marvin owned the remaining 10-percent interest. The business of WR was to purchase and sell unmounted diamonds and to create diamond jewelry for sale to various jewelry dealers and retailers. William died testate. Pursuant to his last will and testament (the will), William made the following bequests: He bequeathed $ 10,000 to each of the children. He also bequeathed $ 60,000 in trust for the benefit of each of Roberta, Hannah, and Iris (but not Marvin). [3] He bequeathed a portion of the residue of his estate outright to Cecil. He bequeathed the remaining portion in trust (the residuary trust) for the benefit of Cecil and the children. *246 Cecil had a life interest in the residuary trust. She also had a particular power to appoint trust assets to the children. The children were to share in the remainder of the residuary trust on the death of Cecil. Renunciations
Following William's death, in April 1977, each of the children renounced his or her interest in the residuary trust and Roberta, Iris, and Hannah each renounced her interest in the $ 60,000 bequeathed in trust for her benefit. The residuary trust was neither established nor funded, and the entire residue of William's estate passed outright to Cecil. William's partnership interest in WR was included in the residue. That interest was valued on the estate tax return for William's estate at $ 632,607. That amount was accepted after audit of the return by the Internal Revenue Service. In consideration of Marvin's renunciation of his interest in the residuary trust, he received an additional 11.25-percent interest in WR, which increased his interest to 21.25 percent. Successor Partnership
In January 1978, Cecil and Marvin formed a partnership under the name of William Rosenblatt (WR2) to continue the business of WR. The initial capital of *247 WR2 consisted of the net worth of WR. That capital was shown in the WR2 partnership agreement (the partnership agreement) as having been contributed 78.75 percent by Cecil and 21.25 percent by Marvin. The partnership agreement provided that, initially, Cecil was to have a 90-percent interest in the profits and losses of WR2 and Marvin was to have a 10-percent interest. The partnership agreement further provided that, beginning in the second year of the partnership, and concluding in the fifth year of the partnership, Cecil's interest in profits and losses was to be decreased (in 10-percent increments, annually), and Marvin's increased (similarly), until each was to receive 50 percent of profits and losses. In June 1978, Marvin's interest in the capital of WR2 was increased from 21.25 percent to 28.37 percent in consideration of his contributing certain pieces of jewelry to the partnership. The June 1979 Agreement and the Supplemental Agreement
On June 30, 1979, Cecil and Marvin entered into two agreements, one an untitled three-page agreement (the June 1979 agreement) and the second a supplement thereto (the supplemental agreement). By way of the June 1979 agreement, Cecil *248 and Marvin agreed that (1) in consideration of receiving $ 270,000 from Marvin, Cecil would sell to him a 46.63-percent interest in WR2 (increasing his capital interest therein from 28.37 percent to 75 percent) and (2) the partnership agreement would be modified, as set forth. In part the June 1979 agreement provides: WITNESSETH:
WHEREAS, the parties hereto did form a partnership under the firm name WILLIAM ROSENBLATT * * *; and * * * WHEREAS, CECIL ROSENBLATT has agreed to sell to MARVIN ROSENBLATT so much of her interest in the partnership as shown on the books of the partnership as of this date to enlarge MARVIN ROSENBLATT'S partnership capital interest to 75% and reduce her capital interest in the partnership to 25%, for $ 270,000 NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth, it is agreed as follows: 1. CECIL ROSENBLATT agrees to accept, concurrent with the signing hereof, the sum of $ 270,000.00 from MARVIN ROSENBLATT for the sale by her to MARVIN ROSENBLATT of a 46.63% interest in the partnership doing business under the name WILLIAM ROSENBLATT, it being agreed: (a) That effective June 1, 1980, after payment of the first promissory *249 note provided for in Subparagraph (d) of this paragraph, the partnership interests of the parties hereto and the division of net profits and losses of the partnership shall be: MARVIN ROSENBLATT
75%
CECIL ROSENBLATT
25%
(b) That after June 1, 1980, the net profits and losses of the partnership shall be divided * * * in accordance with the capital interests as set forth in Subparagraph (a) of this paragraph. * * * (d) The $ 270,000.00 purchase price shall be evidenced by a series of five promissory notes * * * The first four of said notes shall be in the sum of $ 50,000 each, payable June 1, 1980, June 1, 1981, June 1, 1982, and June 1, 1983; the fifth note shall be in the sum of $ 70,000, payable June 1, 1984.
The supplemental agreement provides: SUPPLEMENTAL AGREEMENT TO AGREEMENT DATED JUNE 30, 1979, BY AND BETWEEN CECIL ROSENBLATT AND MARVIN ROSENBLATT
With respect to the interests of the parties over and above their partnership interest in the firm conducted under the partnership name of WILLIAM ROSENBLATT * * * the parties agree as follows: 1. With respect to the three daughters of CECIL ROSENBLATT, to wit: ROBERTA, IRIS and HANNAH, *250 it is agreed that they will be paid out the balance due them pursuant to the understanding made at the time of the death of WILLIAM ROSENBLATT, by June 30, 1980, and that after they are paid out the full amount which was promised to them as aforesaid, no funds of the partnership conducted under the name of WILLIAM ROSENBLATT will be paid to any of the said daughters of CECIL ROSENBLATT, except by mutual consent of the parties hereto. If, after they have been paid out the full amount promised to them, business funds of the partnership conducted under the name of WILLIAM ROSENBLATT are paid to any of the said girls without the consent of MARVIN ROSENBLATT, such advances shall be charged against the capital account of CECIL ROSENBLATT in the said partnership. 2. MARVIN ROSENBLATT agrees and does hereby renounce any and all right he may have to contest the Last Will and Testament of CECIL ROSENBLATT, his mother, it being agreed and understood that CECIL ROSENBLATT shall have the right to dispose of her Estate as she sees fit, without interference or claims on the part of MARVIN ROSENBLATT.
Dated: June 30, 1979 CECIL ROSENBLATT MARVIN ROSENBLATT The December 1979 Agreement
*251 In December 1979, Cecil and Marvin entered into another untitled agreement, whereby Cecil agreed to sell to Marvin her remaining 25-percent interest in WR2 for $ 109,601. The sale was to be effective January 1, 1980, and Marvin was to pay for the transfer by delivering to Cecil a series of promissory notes. Also, Cecil agreed to waive paragraph 1(a) and (b) of the June 1979 agreement, so that, effective January 1, 1980, all profits and losses of WR2 would belong to Marvin. Marvin's Notes
Before negotiating the June 1979 agreement and the supplemental agreement, Marvin prepared a list of issues to be taken up with Cecil. Among the items on the list are: Payout the girls within 9 months, by Dec. 31, 1979, amount agreed upon. * No further business funds to girls - except if mutually agreed and that it reduces your equity. Raise my percent of business to 75%, by Dec. 31, 1979, by signed amendment to partnership agreement (the payout of the girls represents over 50% of original value of business without consideration for taxes, fees and expenses) * Thereafter, I may use all business funds as I choose. * As previously agreed, all 'other' funds are mine, now *252 and in the future You retain 25% of business, with the same buy-out provisions of our partnership agreement, except that I have the option for a total buyout after X (to be determined) number of years. * You receive approximately $ 270,000 - in cash or short-term promissory notes secured by the business, by Dec. 31, 1979 (to raise my equity to 75% of an assumed business value of $ 600,000 of recent accounting record. I must pay the difference between 75% of $ 600,000, or $ 450,000, and the approximately 30%, or $ 180,000, which I now possess $ 450,000 - 180,000 = $ 270,000)
The Ledger Cards
At the time of Cecil's death in 1986, three sets of ledger cards (the ledger cards) were found in a locked cabinet among her papers at WR2's offices. Each set of ledger cards is titled Roberta, Hannah, or Iris, respectively. The entries on the ledger cards were handwritten by Cecil. The information contained on the ledger cards is attached to this report as an appendix. When summed, the amounts shown on the ledgers titled "Roberta", "Iris", and "Hannah" total $ 571,117, $ 574,473, and $ 602,214, respectively. OPINION I. Introduction
Many of the issues presented in *253 these consolidated cases have been settled by the parties. The remaining issues all turn on our analysis of certain events occurring during June 1979. Respondent maintains that, by virtue of two agreements entered into by Cecil and her son, Marvin, in June 1979 (the June 1979 agreement and the supplemental agreement), Cecil made taxable gifts to Marvin in the amount of $ 1,800,000 and to each of his sisters, Roberta, Hannah, and Iris, in the amount of $ 600,000 apiece. Respondent also maintains that the underpayment in gift tax for the calendar quarter ended June 30, 1979 (the June 30 quarter), resulting from Cecil's failure to report such gifts, was due to fraud. Petitioners deny that any such gifts were made and deny any fraud. Marvin and Roberta are petitioners only because respondent has determined that each is liable as a transferee of the property of Cecil for the gift tax liability (and addition to tax) for the June 30 quarter. II. Respondent's Determinations
In respondent's notice of deficiency issued to the Estate with respect to the gift tax, respondent states simply that she has determined that, during the June 30 quarter, Cecil (1) made a gift of 50 percent *254 of a jewelry business with a fair market value of $ 1,800,000 to her son Marvin and (2) made cash gifts of $ 600,000 (taking into account certain settled issues) to each of her daughters, Roberta, Hannah, and Iris (collectively, the daughters or sisters, as appropriate). In her answer, at trial, and on brief, it has become clear that respondent's determination of gift tax liability for the June 30 quarter, is not as straightforward as her notice of deficiency would suggest. Respondent's determination is based on her assumption that the jewelry business in question (WR2, a partnership business) was, at the time of the claimed gifts, worth in excess of $ 3,600,000, and that, by virtue of the June 1979 agreement and the supplemental agreement, Cecil (1) made a bargain sale of a portion of her interest in WR2 to Marvin for $ 1,800,000 less than that portion was worth and (2) obligated herself to pay $ 600,000 to each of her daughters. We will address, in turn, respondent's determinations of gifts made by Cecil to (1) Marvin and (2) his sisters. Our decisions on those issues make it unnecessary for us to address the valuation issue raised by respondent's determinations. III. *255 Gift to Marvin
A. Introduction
During 1979, the gift tax was imposed for each calendar quarter on the transfer of property by gift during that quarter. Sec. 2501. Section 2512 concerns itself with the valuation of gifts. In pertinent part, section 2512 provides: (a) If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. (b) Where the property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar quarter.
Respondent's position is simple: On June 30, 1979, pursuant to the June 1979 agreement, Marvin purchased from Cecil a 46.63-percent interest in WR2, paying for that interest $ 1,800,000 less than it was worth. As explained more fully below, in section IV, respondent has determined that the interest was worth $ 1,800,000 more than Marvin paid for it because respondent believes that Cecil contemporaneously made an equal gift to her daughters. Petitioners' principal position *256 also is simple: Marvin paid full value for the partnership interest, thus negating the possibility of a gift. B. Analysis
Respondent's focus is on June 30, 1979. Respondent argues that, on that date, by virtue of the June 1979 agreement, Marvin received a 46.63-percent interest in WR2 from Cecil. As a result, respondent claims that, had WR2 been liquidated at the close of business on June 30, 1979, Marvin would have been entitled to receive 75 percent of the capital of WR2: Cecil transferred complete dominion and control of a 46.23% [sic.] interest in the capital account of WR2 to petitioner Marvin on June 30, 1979. * * * If Cecil had died between June 30, 1979 and June 30, 1980, the assets of the partnership, after payments of debts to other creditors, would have been distributed to petitioner Marvin pursuant to the capital account. SeeN.Y. Partnership L. § 71(c) (McKinney 1988).
We do not quarrel with respondent's interpretation of New York partnership law. We disagree, however, that, on June 30 1979, pursuant to the June 1979 agreement, Cecil made a contemporaneous transfer of any percentage of her partnership interest to Marvin. The June 1979 agreement *257 states that Cecil has agreed to sell to Marvin so much of her interest in WR2 as "to enlarge MARVIN ROSENBLATT'S partnership capital interest to 75% and reduce her capital interest in the partnership to 25%". In consideration of the transfer of a 46.63-percent interest in WR2 to Marvin (to increase his partnership interest to 75 percent), Marvin is obligated to pay to Cecil $ 270,000, by delivering to her five notes in that total amount. Marvin's partnership interest in WR2 is not to increase to 75 percent immediately, however. The pertinent provision of the June 1979 agreement is as follows: That effective June 1, 1980, after payment of the first promissory note provided for in Subparagraph (d) of this paragraph, the partnership interests of the parties hereto and the division of net profits and losses of the partnership shall be:
MARVIN ROSENBLATT
75%
CECIL ROSENBLATT
25%
[Emphasis added.] Respondent recognizes the difficulty that paragraph 1(a) presents to her. She insists, however, that, contrary to the inference to be drawn from that paragraph, Marvin's interest in WR2 immediately increased to 75 percent. She argues that: "According to the Forms *258 K-1 that were filed with WR2's federal partnership return for the taxable year ending December 31, 1979, the partnership reported that petitioner Marvin had a 75 percent interest in the partnership's capital account and that Cecil had only retained a 25 percent interest." Petitioners argue that respondent has failed to take account of another agreement entered into between Cecil and Marvin subsequent to the June 1979 agreement and before the Forms K-1 in question were filed. Pursuant to that agreement, entered into on December 31, 1979 (the December 1979 agreement), among other things, (1) Cecil agreed to sell to Marvin her remaining 25-percent interest in WR2 and (2) Cecil waived paragraph 1(a) of the June 1979 agreement. That last provision of the December 1979 agreement, argues petitioner, would account for the 75-percent capital interest shown for Marvin on the Forms K-1. The provision of the December 1979 agreement in question reads as follows: CECIL ROSENBLATT hereby waives the provisions of Paragraphs (1)(a),(b),(c) and (e) of the June 30, 1979 Agreement between the parties, it being understood and agreed that all profits and losses effective January 1, 1980 of the *259 business hereafter conducted under the name WILLIAM ROSENBLATT shall belong to MARVIN ROSENBLATT. [Emphasis added.]
Because Cecil's waiver was not effective until January 1, 1980, we do not agree with petitioners that the December 1979 agreement adequately explains the entries on the 1979 Forms K-1. Nevertheless, and although the Forms K-1 are some evidence to the contrary, we find that Marvin's partnership (capital) interest in WR2 did not increase from 25 percent to 75 percent on June 30, 1979. In making that finding, we rely primarily on the June 1979 agreement, which we believe contemplates that Marvin's partnership interest would remain at 25 percent until June 1, 1980, or later, if he were to default on the first promissory note. Such a delayed effective date makes sense to us when we consider Marvin's notes made in anticipation of negotiating with Cecil, Marvin's testimony, and the supplemental agreement. As discussed more fully in section IV, below, Marvin understood that, before June 30, 1980, Cecil was free to withdraw money from WR2 to meet certain obligations of hers to her daughters. It is clear to us that Marvin acknowledged the existence of that obligation, *260 but wanted it satisfied out of partnership assets that he did not view as his. Again as explained more fully below, we view the delayed effective date provision as a method both to allow and to control Cecil's use of partnership funds to satisfy her obligation to her daughters. To the extent that the Forms K-1 indicate that Marvin's interest in the capital of WR2 increased to 75 percent before January 1, 1980, we believe that they are in error. Respondent has asserted no theory with regard to the claimed gift by Cecil to Marvin other than that, on June 30, 1979, as a result of the June 1979 agreement, Marvin received a gift from Cecil because Marvin's capital interest in WR2 increased by 46.63 percent on that date. In particular, respondent has not argued that a transfer by gift constituted a binding promise to transfer a capital interest to Marvin in the future. Such a theory would give rise to difficult questions of valuation, based, in part, on Cecil's control of her capital interest during the interim. Clearly, respondent knows how to argue that a binding promise constitutes a transfer by gift. That is precisely the argument that respondent makes with regard to the daughters. *261 Because respondent has not argued a gift by promise, and because of the valuation difficulties presented, we will not go beyond respondent's theory that Marvin's capital interest in WR2 increased by 46.63 percent on June 30, 1979. Having found that, as a result of the 1979 agreement, Marvin's capital interest in WR2 did not increase during the June 30 quarter, we hold that there was no transfer by gift from Cecil to Marvin during that quarter on account of the sale by Cecil to Marvin of a 46.63-percent interest in WR2. IV. Gifts to the Daughters
A. Introduction
Respondent has determined transfers by gift, by Cecil, of $ 600,000 to each of the daughters during the June 30 quarter, although respondent states on brief that payment of such amounts occurred between August 1979 and the end of 1983. Respondent explains that seeming discrepancy by arguing that, in June 1979, Cecil made a binding promise to make a gift, which itself constitutes a transfer by gift. We agree that a binding promise to make a gift can constitute a transfer by gift for purposes of section 2501; we do not agree, however, that such a binding promise was made here. B. Promises to Make a Gift
*262 The rule with regard to a promise to make a gift has been well stated by the Court of Appeals for the Second Circuit, in Rosenthal v. Commissioner, 205 F.2d 505, 509 (1953), revg. and remanding 17 T.C. 1047 (1951): "a binding promise to make a gift becomes subject to gift taxation in the year the obligation is undertaken and not when the discharging payments are made." That was the view of the Tax Court in Rosenthal v. Commissioner, 17 T.C. 1047 (1951), which was revd. and remanded by the Court of Appeals for the Second Circuit, 205 F.2d 505 (2d Cir. 1953), to determine whether the binding promise in question was made in consideration of the release of the taxpayer from an earlier binding promise. See also Estate of Copley v. Commissioner, 15 T.C. 17, 20 (1950) (payments made in 1936 and 1944, pursuant to a binding contract (an antenuptial agreement) entered into in 1931, were not taxable as gifts in 1936 and 1944), affd. 194 F.2d 364 (7th Cir. 1952). C. The Supplemental Agreement
Respondent finds binding *263 promises to make gifts to the daughters in the supplemental agreement. The supplemental agreement was entered into in connection with the June 1979 agreement, whereby, among other things, Cecil agreed to sell to Marvin a 46.63-percent interest in WR2. The pertinent language of the supplemental agreement is as follows: 1. With respect to the three daughters of CECIL ROSENBLATT, to wit: ROBERTA, IRIS and HANNAH, it is agreed that they will be paid out the balance due them pursuant to the understanding made at the time of the death of WILLIAM ROSENBLATT, by June 30, 1980, and that after they are paid out the full amount which was promised to them as aforesaid, no funds of the partnership conducted under the name of WILLIAM ROSENBLATT will be paid to any of the said daughters of CECIL ROSENBLATT, except by mutual consent of the parties hereto. * * * Neither the supplemental agreement nor the June 1979 agreement spells out either (1) the understanding made at the time of the death of William Rosenblatt or (2) any balance due pursuant thereto. Respondent has proposed a finding that there was an agreement between Cecil and the children that she would distribute to them the *264 assets left in her control after the death of William. Based on the ledger cards found among Cecil's papers after her death, respondent theorizes that the agreement was to pay to each daughter $ 600,000 (and to Marvin $ 1,800,000). Reading the supplemental agreement together with the June 1979 agreement, respondent concludes that the daughters are third party beneficiaries of an agreement between Cecil and Marvin, with an enforceable right to receive $ 600,000 apiece. D. The Daughters' Position
The daughters' position is clear: While all of The Daughters received some financial support or gifts from Decedent at times, which gifts are the subject of settled issues in this case, none of them ever received a promise of payment of $ 600,000.00 each and none of them ever received property or money with value anywhere near $ 600,000.00.
While the daughters' position leaves open the possibility that they were promised, and received, some amount (still substantial), but nowhere near $ 600,000, we need not explore that possibility. The daughters challenge directly respondent's fundamental premise that the supplemental agreement constituted a binding promise to make gifts *265 to them: "The Supplemental Agreement created no enforceable promise to transfer money or property by gift to The Daughters, as third party beneficiaries, as the promise was too vague and ambiguous to be enforceable." Fundamentally, we agree with the daughters. E. Analysis
1. Third Party Beneficiaries
The Court of Appeals for the Second Circuit (to which an appeal in this case might lie) has recently summarized pertinent aspects of the law of New York (the applicable law) concerning third party beneficiaries: An intended third party beneficiary will be found when it is appropriate to recognize a right to performance in the third party and the circumstances indicate that the promisee intends to give the third party the benefit of the promised performance. Restatement (Second) of Contracts § 302 (1981). New York has adopted the Restatement approach in determining whether a third party beneficiary exists. Septembertide Publishing, B.V. v. Stein & Day, Inc., 884 F.2d 675, 679 (2d Cir 1989); Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 66 N.Y.2d 38, 44-45, 495 N.Y.S.2d 1, 5, 485 N.E.2d 208, 212 (1985). *266 In determining third party beneficiary status it is permissible for the court to look at the surrounding circumstances as well as the agreement. Septembertide, 884 F.2d at 679; Fourth Ocean, 66 N.Y.2d at 45, 495 N.Y.S.2d at 5, 485 N.E.2d at 212. Moreover, it is well-settled that the obligation to perform to the third party beneficiary need not be expressly stated in the contract. Vista Co. v. Columbia Pictures Indus., Inc., 725 F.Supp. 1286, 1296 (S.D.N.Y. 1989); see also Strauss v. Belle Realty Co., 98 A.D.2d 424, 426-27, 469 N.Y.S.2d 948, 950 (2d Dep't 1983) (to enforce promise third party need not be identified in contract but need only show intent of contracting parties to benefit third party), aff'd65 N.Y.2d 399, 492 N.Y.S.2d 555, 482 N.E.2d 34 (1985).
Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 573 (2d Cir. 1991). Restatement, Contracts 2d, sec. 302 (sec. 302), distinguishes an "intended" *267 beneficiary, who acquires a right by virtue of a promise, from an "incidental" beneficiary, who does not. See Restatement, Contracts 2d, secs. 304, 315. Sec. 302 provides: Intended and Incidental Beneficiaries (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance; (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.
2. Cecil's Promise; Marvin's Intent
Cecil was the promisor and Marvin was the promisee. We must determine whether the sisters were intended or incidental beneficiaries of a promise by Cecil to Marvin to pay money to them. There is convincing evidence that (1) Marvin believed that his mother was obligated to his sisters and (2) the supplemental agreement manifested his intent for her to meet her obligations. *268 [4] Marvin testified that his "intention was to have her meet her obligations * * * within a brief period of time." Cecil signed the supplemental agreement. We thus have no trouble in concluding that the first requirement of sec. 302 is met: The daughters could show that recognition of a right to performance in them (to have Cecil discharge her obligation to them) "is appropriate to effectuate the intention of the parties". Sec. 302(1). Nevertheless, we believe that the evidence contradicts the second requirement of sec. 302: Either (1) "the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary" or (2) "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance". Sec. 302(1)(a) and (b), respectively. *269 Respondent has not argued (nor would we agree) that Marvin had any obligation to his sisters. Rather, respondent argues: Petitioner Marvin's stated purpose in signing the Supplemental Agreement was to require his mother to meet her obligation to his sisters based on a promise that she had made to them at the time of the death of their father. Petitioner Marvin intended that his sisters would benefit from this contract. The plain meaning of the Supplemental Agreement is evidence of petitioner Marvin's intent to make the contract enforceable by the sisters.
We infer that respondent believes that the conditions of sec. 302(1)(b) are satisfied. We disagree. We do not believe that Marvin intended to give his sisters the benefit of the promised performance, except incidentally. Indeed, Marvin testified that, after his father's death, "I wasn't on very close terms with, particularly, two of my three sisters." We believe that Marvin intended to give himself the benefit of the promised performance, by limiting what money his mother could take out of WR2 to benefit his sisters, and by providing a limited period during which she could do that. On cross examination, Marvin *270 testified as follows: Q When you started negotiating with your mother to obtain the controlling interest in William Rosenblatt -- A Yes. Q -- was it a concern of yours that your mother had given support to your sisters in the past? A Yes. Q During these negotiations, were you concerned that, if she continued to give considerable support, she would be taking money from the business to do so? A Could you repeat the question? Q Were you concerned, during these negotiations, that if she continued to give large amounts of money to your sister[s] -- were you concerned that she would take it out of the business if she retained an interest in the business? A I was concerned that any money she took out of the business was partially mine and she shouldn't do that because -- without my approval, small or large sums. * * * Q Was your purpose for entering into * * * [the supplemental] agreement with your mother to assure that you would limit her access to business funds to make any payments to your * * * sisters? A No, not to make any. I think it states that, if I accepted her withdrawals, that it would be okay, but it would be debited to her account. I think *271 that's plainly stated. Q So when I say -- but -- but in other words, the purpose of the agreement was to limit and control your mother's withdrawal from the business to make payments to your sister -- sisters. In other words -- A I wanted to -- Q -- they were controls put on your mother, this agreement. A The purpose of this was basically to go public. It's just to formalize something, where it was said specifically that she could not. Now, that didn't mean that she pilfered the cookie jar. It just meant the I wanted it recorded. I wanted it said, written down. * * * Q Did you enter into this agreement because you felt it was necessary that the -- that some kind of controls be put on your mother withdrawing funds? A I would term it necessary. As I said, I wanted to go public. I believed that, if I went totally public in the sense that -- a document -- she would live up to it.
We think that Marvin's intent is well summed up in the final exchange between respondent's counsel and Marvin. Marvin intended to memorialize how and when his mother could take money out of the business to benefit his sisters. For a year, she was free to do so without his assent, *272 subject only to the implicit limitation that, were she to take too much money out of WR2, Marvin might refuse to honor his notes given to her in consideration for the 46.63-percent interest he was to receive from her on June 1, 1980. Thereafter, the supplemental agreement required Marvin to consent if Cecil wanted to pay out WR2 funds to her daughters. All of this, we believe, was principally for Marvin's benefit. Marvin testified that he did not know whether his sisters were aware of the supplemental agreement. Roberta and Iris testified that they did not have knowledge of the supplemental agreement at any time before the death of Cecil in 1986. That the daughters were not aware of the supplemental agreement is consistent with Marvin not having their benefit as his principal concern. Moreover, in large part because Marvin did not tell them about it, and based on the record as a whole, we do not believe that he intended to vest in his sisters a right to enforce the supplemental agreement, and we so find. We find that Cecil's daughters were incidental beneficiaries of the agreement between Cecil and Marvin, with that agreement giving them no enforceable rights against Cecil. *273 Cf. Burke v. North Huntingdon Twp. Municipal Authority, 390 Pa. 588, 136 A.2d 310, 315 (1957) (contract stating that third party's claims would be paid out of the purchase price of property "simply purports to set up an intra-party plan for the payment of the seller's obligations"). Therefore, we hold that Cecil made no transfer by gift to them during the June 30 quarter pursuant to the June 1979 agreement and supplemental agreement. As previously stated, we do not have before us those periods during which respondent claims there were actual transfers of funds to the daughters pursuant to the obligations that respondent claims arose from the 1979 agreement and supplemental agreement. [5]
*274 V. Transferee Liability and Fraud
Since we hold that no taxable gifts were made by Cecil to petitioner Roberta or to petitioner Marvin during the period in issue, we must conclude that no transferee liability is imposed on Marvin and Roberta under section 6324(b). Furthermore, respondent has not carried her burden of proof with respect to whether petitioner Estate of Cecil is liable for the fraud penalty for fraudulent underpayment of gift tax during the period in issue. Sec. 6653(b); Rule 142(b). VI. Conclusion
Inasmuch as we have found that petitioners have carried their burden of proof that no taxable gifts occurred during the period in issue, it necessarily follows that respondent's transferee liability and fraud penalty determinations cannot be sustained. We do not uphold respondent's determinations in any respect. To reflect the foregoing and due to agreements between the parties, Decisions will be entered under Rule 155. Appendix
Entries on the ledger cards found among Cecil Rosenblatt's papers after her death. The ledger titled "Roberta" contains the following entries:
DATE
ITEM
AMOUNT
Aug/79
$ 360,000  Oct 4/79
5,000  1/6/80
Dep
25,000  3/20/80
15,000  4/16/80
15,000  1/1/81
30,000  6/15/81
30,000  8/24
Watch
250  8/26
Diam Choker
6,000  10/26
Gave Storager
for Paintings
4,720.80
10/26
CR Gave Ck to Hackett
4,268.50
Jan/82
Dep
10,000  1/15/82
CR check to Hackett
4,509  1/8/82
Lisa
500  3/5
Pearls
486  illegible
illegible
383  1/10/83
Dep
30,000  6/16
Dep
30,000  The ledger titled "Iris" contains the following entries:
DATE
ITEM
AMOUNT
Aug/79
$ 360,000  9/5/79
5,000  2/7/80
25,000  3/24/80
Broach & Chain
6,500  5/7/80
Gold [illegible]
125  5/27/80
Ring & Brac.
2,350  5/27/80
Diam. Earclips
2,500  6/13/80
Cash
5,000  6/13/80
Gold Choker
500  8/4/80
Mary's Saph. Ring
1,650  8/28/80
Star Earclips
2,500  9/15/80
Watch
1,800  Cartier Gold Brac.
1,000  9/18/80
Cufflinks
600  9/23/80
Lapis Brac & Clips
550  Pr. Pearl Earclips
550  9/23/80
Diam. Bracelet
4,500  10/2/80
Silver Box & Brac.
100  10/28
Ruby Earrings(Mary)
600  12/4
Cufflinks
140  12/5
Chains & Boxes
325  12/9/80
Cash
5,000  12/15/80
Repairing Diam &
285.65
Appraisal
1,135  1/1/81
Dep.
20,000  5/5/81
Ruby Rings
1,200  Cufflinks
100  5/12/81
15.20 Emer. Cut
30,000  6/9/81
Mtg. of 15.20 Em.Cut
2,072  6/11/81
Jossie Studs
400  8/26/81
Susan Earrings[illegible]
400  9/3/81
Pearls
1,000  9/8/81
Watch A.P.
1,000  9/10/81
Red Watch
900  9/14/81
Rolex Watch
1,500  9/22/81
1 Ruby & 1 Saph. Earrings
1,200  11/20
Choker Diam
10,500  11/23
C.R. loaned I.G.
1,000  1/22/82
C.R. loaned I.G.
7,000  Cufflinks 2 Pr.
300  1/26
Gold Brac. lengthen
150  3/16
Pearl Earclips
65  3/31/82
3 Watches
3,900  4/8
Saph Ring
2,800  5/10
Earclips
1,075  1/83
M.R. Pd.
30,000  6/8/83
30,000  12/3
Cufflinks
200  The ledger titled "Hannah" contains the following entries:
DATE
ITEM
AMOUNT
Aug/79
$ 360,000  Oct 2/79
20,000  Dec 18/79
5,000  Jan 16/80
25,000  Jan 16/80
Dep
5,000  Feb 8/80
2,500  Feb 14/80
2,500  3/11/80
loaned by CR to HG
1,500  4/9/80
loaned to HG by CR
15,000  6/20/80
by CR
7,000  8/15/80
by CR
5,000  8/28/80
by CR
1,500  9/29/80
by CR
1,000  10/20/8
by CR
5,000  Airline Ticket
868  Diam Studs
600  11/13/80
CK by CR
2,500  11/24/80
Studs
600  12/5/80
Ck by CR
2,053  12/15/80
2 Diam Hearts
750  2/27/81
CK by CR
1,500  3/27/81
Airline Tickets
1,044.90
4/3/81
Ck by CR
2,000  4/8/81
Ck by CR
25,000  6/19/81
Ck to HG
4,000  6/19/81
Ck to HG
1,000  8/25/81
Gave to HG
2,500  10/19/81
Ck to HG
5,000  12/23/81
Ck to HG
5,000.90
3/1/82
Ticket to Paris 2/16
685  Ticket to LA
84  3/4
CR [illegible]
25,000  Ticket to LA 2/9
84  Ticket to Geneva
260  Ticket to NY 3/1
392  5/29
Ck to HG
5,000  12/7
CR sent ck
5,000  3,500  1/83
MR pd
21,500  5/3
Airline
292  6/6/83
MR pd
30,000  *275 Footnotes
1. Cases of the following petitioners are consolidated herewith: Roberta Schreiber Ulmer, docket No. 12602-91; Marvin Rosenblatt, docket No. 14026-91; Estate of Cecil Rosenblatt, Deceased, Roberta Schreiber Ulmer, Hannah Goldstein, and Iris Gruenebaum, Administratrices, C.T.A., c/o Matthew F. Sarnell, Esq., docket Nos. 14348-91 and 14349-91.↩
2. I.R.C., sec. 6653(b) was amended by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 325(a), 96 Stat. 324, 616. The TEFRA version of sec. 6653(b) modified the calculation of the fraud addition. The statutory notices with respect to the periods ending Dec. 31, 1982, and Dec. 31, 1984 (after the effective date of TEFRA), do not expressly indicate whether respondent used the post-TEFRA formulation. Since the parties have settled the issues regarding those years, we assume that the parties have taken into account any relevant changes in the law. All citations to sec. 6653↩ are intended to refer to that section as effective during the relevant periods in issue.
3. The will explains William's failure to make such a bequest to Marvin by stating that Marvin had been assisted in establishing himself in his own business and was a partner with his father in the William Rosenblatt partnership, from which he would draw a salary until the assets of that business were liquidated.↩
4. With regard to the supplemental agreement, Marvin was asked on direct examination: Q And can you tell me, did you have an idea or some comprehension of what was meant by the phrase "pursuant to the understanding made at the time of the death of William Rosenblatt"?
He answered: A I believe it meant that my mother had reached some understanding with my sisters based on a promise that she had made to them at that time [at the time of their renunciations of bequests under William's will], and my purpose in signing this and having it -- agreeing to it was to require by mother to meet her obligations to my sisters.↩
5. Nor need we consider whether those transfers were not transfers by gift because supported by the consideration of the daughters' previous renunciations of bequests under the will of William Rosenblatt. See, e.g., Rosenthal v. Commissioner, 205 F.2d 505 (2d Cir. 1953), revg. and remanding 17 T.C. 1047↩ (1951).